914 So.2d 1195 (2005)
CITY OF MINDEN, Plaintiff-Appellee
v.
Thomas G. RAY, Defendant-Appellant.
No. 40,247-CA.
Court of Appeal of Louisiana, Second Circuit.
November 4, 2005.
Robert V. McAnelly, for Appellant.
L. Charles Minifield, for Appellee.
Before BROWN, STEWART & PEATROSS, JJ.
PEATROSS, J.
This appeal arises from a dispute over a "Continuing Guaranty" executed on November 27, 1987, by Thomas G. Ray, on behalf of Sportco of Minden, Inc. ("Sportco"). *1196 Both parties filed a Motion for Summary Judgment on the matter. The trial court granted a Motion for Summary Judgment in favor of the City of Minden, Louisiana ("the City") finding that Mr. Ray signed the aforementioned Continuing Guaranty and, in so doing, bound himself personally as well as Sportco to the debt that attached. The trial court further denied the Motion for Summary filed by Mr. Ray. Mr. Ray now appeals arguing, inter alia, that several genuine issues of material fact are present and evidenced in the record of the case sub judice. For the reasons set forth herein, the ruling of the trial court is affirmed in part, reversed in part, and remanded.

FACTS
On November 4, 1987, the City entered into a loan contract with the State of Louisiana, Division of Administration, after receiving a community block grant for $750,000. The purpose of this grant was to provide permanent long-term financing to Sportco, a leisure boating business, for the "acquisition of machinery, inventory and rehabilitation of the existing grounds and buildings of Sportco." Prior to securing this loan, Sportco purchased $377,635 worth of the foreclosed-upon assets of Tidewater, Inc., a (previously) failed boating business, from Minden Bank and Trust.
On November 17, 1987, the State of Louisiana officially entered into the contract with Sportco through its then-President, Mr. Ray. Repayment of the loan was further guaranteed by Mr. Ray's personal "Continuing Guaranty," dated November 27, 1987.[1] The contract required Sportco to secure the loan by placing a first mortgage on the boat building equipment, materials, inventory, tools and supplies, and by securing a second mortgage on Sportco's building and immovable property. The second mortgage was not, however, recorded by Mr. Ray and Sportco until 1992, some five years later.
The contract required Sportco to invest $150,000 to rehabilitate the buildings and grounds and to purchase (additional) materials valued at $175,000 and equipment/inventory valued at $395,000. The company complied with these requirements. Not long after, Sportco suffered hard times and became unable to make all of its debt payments. On November 13, 1990, the parties jointly amended the original contract to defer all of Sportco's payments until April 1991 and to provide that all future payments would be split equally between the City and State. Mr. Ray signed the amendment on behalf of Sportco.
Sportco's cash flow problems remained unresolved, and on May 7, 1992, Mr. Ray sold parcels of land and some equipment owned by the corporation for $190,000 (with the express consent of the City).[2] Despite the aforementioned measures, Sportco continued to struggle; and, in October 1992, Mr. Ray resigned as President, sold his stock to the remaining stockholders and left the company in pursuit of other ventures. Sportco then defaulted on *1197 its loan, the last payment of which was made in December 1989.
On October 6, 1992, Melvin Smith,[3] the General Manager of Sportco, wrote a letter to Minden Mayor Bill Robertson informing him that Sportco had applied for a $200,000 loan with Progressive National Bank ("PNB") which was used to purchase additional inventory. This loan was to be secured by: (a) all checking/deposit accounts; (b) all inventory, including raw materials, component parts, finished goods and trailers; (c) all office or business equipment, including fixtures and furniture; and (d) all accounts receivable.
On November 2, 1992, with written approval from the State, the City entered into an Act of Subordination affecting all movable property set forth in sections "(b)" and "(c)," supra, of the letter written by Mr. Smith four weeks earlier. On July 14, 1993, Sportco Building "No. One," which was the principal manufacturing building, caught fire and was completely destroyed.
In 1994, Sportco filed for Chapter 11 bankruptcy. Two years later, the City filed the underlying lawsuit against Mr. Ray, asserting that it was owed $631,038, an amount it claims was personally guaranteed by him, via the Continuing Guaranty.[4]
On March 9, 2004, the City filed a Motion for Summary Judgment, which included the affidavit of Robert Foley, a forensic document examiner, in which he concluded that the signature on the Continuing Guaranty was that of Mr. Ray.[5] On April 26, 2004, Mr. Ray filed a Motion for Summary Judgment, asserting for the first time: (1) confusion regarding the word "securities"[6] in the Continuing Guaranty; and (2) the defense of "impairment of collateral." The trial court granted the motion in favor of the City, and assigned the following oral reasons:
I do feel that Paragraph 5 of the defendant's answer, defendant admits executing a document entitled "Continuing Guaranty" on or about November 27, 1987. I think that is an admission that he signed the continuing guaranty, and even if it is not an admission, the City has attached the affidavit of Mr. Foley, concluding that that signature is in fact Mr. Ray's and that there [has] been no expert affidavit, handwriting expert attached to the defense's motion or opposition which would oppose or refute that conclusion by Mr. Foley. So I think that Mr. Ray did in fact sign the continuing guaranty ... [T]he continuing guaranty is extremely broad. Mr. Ray, of course, had the opportunity to have his lawyer look at that and negotiate some of that very broad language out of there, for whatever reason, chose not to do that, and I do think that the language taken of the continuing guaranty taken as a whole gives the City or gave the City the legal right to do everything that they did, including the subordination. And I do think that Mr. Ray also obtained *1198 some benefit from that subordination. By admission of both parties the business was in financial straights [sic] at that time. The infusion of additional capital was done in hopes that Sportco could right itself and become financially stable again. And if that had happened, then they may could have paid off this debt, which would definitely have inured to the benefit of Mr. Ray. So I don't think the subordination was, could just be said to be in total detriment of Mr. Ray's rights, ... so I think the debt is owed.
From this ruling, Mr. Ray filed a devolutive appeal.

DISCUSSION
Assignment of Error One (verbatim): The trial court erred in granting plaintiff-appellee's motion for summary judgment as there were several genuine issues of material fact that should have precluded summary judgment. Further, due to the appellee's violation of appellant's rights to subrogation, as a matter of law, the appellee forfeited their claim against appellant, and their motion should have been denied.
Assignment of Error Two (verbatim): The trial court erred in denying defendant-appellant's motion for summary judgment as there were no genuine issues of material fact related thereto and defendant-appellant was entitled to judgment in his favor as a matter of law.
Due to the interrelatedness of the issues on appeal in the case sub judice, we have elected to address the assignments of error collectively.
Mr. Ray initially points out that La. C.C.P. art. 966(B) states, in part:
The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.
He argues that there exist several factual disputes associated with the City's Motion for Summary Judgment; and, accordingly, it should have been denied. To the contrary, however, Mr. Ray contends that there are no factual disputes as to the issues raised in his Motion for Summary Judgment and, as the "law is in his favor, his motion should be granted."[7]
Mr. Ray admits to having signed several loan guarantees during his tenure as Sportco's President; however, he claims to never have admitted signing the "Continuing Guaranty" at issue in this case. His brief argues that whether or not Mr. Ray signed the Continuing Guaranty "... is a genuine dispute of a disputed fact of the highest order, and one that should have been sufficient to deny the City's motion for summary judgment...."
Mr. Ray further states that "the City was more interested in creating jobs in Minden than they were in having the Sportco contract repaid." To this end, Mr. Ray asserts that the City maintained the Sportco contract/loan in a "cavalier" and irresponsible manner which he argues is confirmed "by the fact that Sportco did not even bother to record its mortgage ... until five years after the contract was signed." (Emphasis Mr. Ray's.) Accordingly, he claims that this failure (not filing for five years) reflects a genuine issue of material fact as to its validity, and, in turn, *1199 a basis for denial of the City's motion for summary judgment.
Mr. Ray next argues that Sportco was never given "credit" by the City for the sale of $190,000 of movable and immovable assets on May 7, 1992. He states that the City has not disputed this fact but has not shown a ledger reflecting such a credit (or lack thereof). Accordingly, Mr. Ray argues that the amount which was owed (or should be if the credit was, in fact, omitted) is a material issue of genuine fact and a basis for denial of the motion for summary judgment.
Finally, Mr. Ray states that the most significant undisputed fact is that the City, without his consent, released "all" movable property secured by the Sportco loan. He asserts that this action by the City "totally ignored and irreparably destroyed [his] subrogation rights...." In summary, Mr. Ray states that the City bears the burden of proof to show that he was not prejudiced by the release of collateral in this case.
The City initially responds by citing a bevy of jurisprudence standing for the proposition that contracts of guaranty are to be interpreted in the same manner as general contracts.[8]
The City next refutes Mr. Ray's claim of never having signed the Continuing Guaranty at issue. It argues that the Continuing Guaranty was signed by Mr. Ray and bound him in solido with Sportco. The City cites La. C.C. art. 1853, stating, in pertinent part:
A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it.
From this, the City points out that Mr. Ray admitted to signing "a guarantee somewhere along the line" and admitted to executing a document entitled "Continuing Guaranty" on or about November 27, 1987. It argues that his statements, coupled with Mr. Foley's opinion (that it was Mr. Ray's signature on the Continuing Guaranty) amounts to a judicial confession, per La. C.C. art. 1853, supra.
The City also refutes Mr. Ray's contention that it, the City, was "more interested in creating jobs" than in repayment of the loan at issue. It points to the testimony of Mayor Roberston, who stated that, while there was an interest in creating jobs, the City "clearly wanted the loan re-paid." The City asserts the failure to record the guaranty was an oversight, not an implicit admission of recklessness or disregard about the loan's repayment. Accordingly, it argues there is no genuine issue of material fact on this point.
The City next addresses Mr. Ray's assertion that Sportco was never given credit for the sale of $190,000 movable and immovable assets on May 17, 1992. It points out that "Ray consented to and was party to the `Partial Release of Contract.'" (Emphasis the City's.) From this, it reasserts that there exists no genuine issue of material fact on this argument.
Next, the City addresses Mr. Ray's assertion that the City's release of Sportco's *1200 collateral "destroyed" his contractual and statutory rights to subrogation. It disputes Mr. Ray's claim that the Act of Subordination was a "release" of Sportco's collateral to PNB. In Tallulah Production Credit Ass'n v. Turner, 391 So.2d 885 (La. App. 2d Cir.1980), writ denied, 396 So.2d 900 (La.1981), this court stated that an Act of Subordination relates only to the ranking of security rights held by the debtor and the creditor does not define or limit, or limit the effect of the security. Accordingly, the City states that the Act of Subordination in no way released the security at issue in this case.
The City's brief next addresses a myriad of ancillary arguments to the case sub judice. For example, it contends that it "is clear" from the Continuing Guaranty that Mr. Ray waived the defense of impairment of collateral. It points out that the Continuing Guaranty states, in pertinent part:
The City or State shall not be bound to exhaust its recourse against the debtor or other persons or upon the securities it may hold before being entitled to payment from the undersigned of the amount hereby guaranteed.
From this, the City also notes that Mr. Ray never revoked the Continuing Guaranty in whole or in part prior to resigning as President of Sportco. Similarly, it asserts that Mr. Ray "waived the right to object to any extension of the loan" as the Continuing Guaranty expressly states that the City may "grant extensions" as necessary. To this end, it rejects Mr. Ray's argument that he should be released (because he sold his stock and resigned from the company) as no payments on the loan were made after December 1989, some three years prior to his resignation.
In his second assignment of error, Mr. Ray argues that, while he has never admitted to signing the Continuing Guaranty at issue in this case, the "City claims he did, so for the purposes of this appeal, the disputed document must be analyzed." From this point, Mr. Ray addresses each line of the Continuing Guaranty and makes arguments where he sees fit.
Mr. Ray states that the first sentence reflects "no factual or legal dispute ..." in his view. He then cites the language of the second sentence, which reads:
The City or State may, in its judgment, grant extensions, take and give up securities, accent compositions, grant releases and discharges, make changes in the terms of its contract or manner of doing business with debtor and with other parties and securities in relation thereto.
Mr. Ray asserts that it is "hard to fully comprehend what this sentence means." He further states that the word "securities" in the guaranty was a "typographical error" and is, in fact, supposed to mean "sureties."[9] He next states that the "grant accents" language of the Continuing Guaranty is ambiguous, by arguing "[w]hat in the world is that?" He continues to make a variety of arguments which stand for the proposition that, inter alia, the Continuing Guaranty is vague, was improperly drawn and should be construed against the City.
In summary, Mr. Ray asserts that there exists several genuine issues of material fact in this case and that the trial judge's ruling was incorrect.
*1201 The City responds by arguing that Mr. Ray's analysis of the Continuing Guaranty is misplaced. The City alleges that, contrary to Mr. Ray's interpretation, the word "securities" should not be interpreted to mean "sureties." It argues that the term "security" is accurately defined by Black's Law Dictionary as:
[P]rotection; assurance; indemnification. The term is usually applied to an obligation, pledge, mortgage, deposit, lien, etc., given by a debtor in order to assure payment or performance of his debt, by furnishing the creditor with a resource to be used in case of failure in the principal obligation. Collateral given by a debtor to secure a loan.
It asserts that the "security" referenced in the Continuing Guaranty meant "collateral;" and, accordingly, Mr. Ray "clearly waived the right as to how the City handled the security ..."
The City further states that Mr. Ray's argument that, because no actual stock or bond certificates existed, nothing could be "taken or given up," is misplaced. It points out that the trial judge agreed that, because the Continuing Guaranty is "extremely broad," the City "had a right to do what it did."
Finally, the City asserts that, assuming, arguendo, that this court does find an impairment of the collateral at issue and no waiver of that impairment, Mr. Ray was not prejudiced by the Act of Subordination. It argues that, in order to obtain a release under La. C.C. art. 3061, Sportco would have to show that its right to subrogation was prejudiced under Robbins Tire & Rubber Co. Inc. v. Winnfield Retread, Inc., 577 So.2d 1189 (La.App. 2d Cir.1991), in which this court stated, in part:
Under the present facts and 1987 codal revisions, Straughan would be classified as a commercial surety, LSA-C.C. Art. 3042 (Rev.1987), and the impairment of real security for the principal obligation would result in a discharge correlative to the prejudice caused, LSA-C.C. Art. 3062 (Rev.1987). Former provisions failed to differentiate between types of sureties, and granted complete extinguishment if prejudice occurred. Jurisprudentially, however, the surety who collected a fee for his services did not receive the same rigid protection. Prior to January 1, 1988, the effective date of the 1987 revisions, a surety invoking extinguishment as a defense faced the burden of preponderately proving his claim. Presently, however, LSA-C.C. Art. 3062 (Rev.1987) requires that the creditor show a lack of prejudice once the issue arises. Hence, to that extent, the extent of such procedural changes, arguably the changes to Article 3062 necessitate retroactive application. (Citations omitted.)
The City points out that Mr. Ray was fully apprised of Sportco's financial situation at all times, yet he never gave written notice of an intent of his discontinuance as a personal guarantor, nor did he take any other, similar remedial measures. As such, the City concludes that Mr. Ray signed the Continuing Guaranty and, accordingly, that no genuine issue of material fact exists with regards to this issue. We agree in part and disagree in part.
There is no genuine issue of material fact regarding whether or not Mr. Ray signed the Continuing Guaranty. The record reflects that Mr. Foley, a highly qualified forensic document examiner, found within "the highest degree of confidence" that the signature on the Continuing Guaranty was that of Mr. Ray. Further, in his Answer, Mr. Ray's attorney submitted the following:

Defendant admits executing a document entitled "Continuing Guaranty" on or about November 27, 1987. That document, *1202 which was not attached to the petition as claimed by plaintiff, is the best evidence of its contents. As the allegations of paragraph 5 are incapable of being answered and as they make conclusions of law, all allegations of said paragraph are denied. (Emphasis ours.)
Similarly, this court notes that, not only did he give the aforementioned admission in his Answer, but Mr. Ray has offered no evidence of another document entitled "Continuing Guaranty" that he "executed," nor anything even remotely similar. Given the trial judge's finding and the aforementioned evidence (or lack thereof), this court finds that the signature was that of Mr. Ray and that no genuine issue of material fact exists on this point.
We next address the issue surrounding Mr. Ray's subrogation rights (or lack thereof). On this issue, we note that, in his Written Reasons, the trial judge stated that the language of the Continuing Guaranty was extremely broad and that Mr. Ray had ample opportunity to have his lawyer review the document. He further stated, and we agree, that the City had the legal right to do what it did, including the subordination. Moreover, the record indicates that all parties were fully apprised of Sportco's financial position, and that Mr. Ray actually received some benefit from the subordination. For these reasons, we agree with the trial judge that the subordination was not to the total detriment of Mr. Ray's rights. Accordingly, we agree with the trial court's ruling on this issue and find no genuine issue of material fact on this point.
We are of the view, however, that this case centers around the curious "disappearance" of the $190,000 in proceeds of sale on May 7, 1992 (for which Mr. Ray asserts he was "never given credit") and, similarly, the unaccounted for "insurance proceeds" from the fire on July 14, 1993.[10] Mr. Ray astutely points out that the City has not shown a ledger or any similar evidence regarding the whereabouts of this money. The City, in turn, argues that `Ray consented and was party to the `Partial Release of Contract.'" (Emphasis the City's.) It points out that Mr. Ray never showed any evidence that the City received a portion of the $190,000. While that may be the case, the fact remains that the whereabouts of this missing money has been left unanswered and the amount owed by Mr. Ray is clearly disputed. Accordingly, in our view, this unanswered question lends itself to the amount which Mr. Ray owes in this case, i.e., a genuine issue of material fact.
Similarly, we find that a genuine issue of material fact exists as to the insurance proceeds resulting from the fire which destroyed "Building One" on July 14, 1993. We note the following discourse between the attorneys to this case and the trial judge:
McAnelly: In addition, Mr. Minifield in his opposition to my motion for summary judgment has stated that the insurance  there was insurance proceeds that were generated as a result of a fire out at the  out at the premises.
. . .
The Court: Before you do that, let me just ask Mr. Minifield a couple, a couple of questions. Mr. Minifield, what about the allegations that Sportco is *1203 entitled to some credit because of the insurance proceeds or because of infusion of other capital?
. . .
Minifield: Right. Six hundred thirty-one thousand thirty-eight dollars, plus interest and attorney's fees.... So there's no dispute as to the admission of Sportco.
. . .
McAnelly: Your honor, the amount owed is disputed. We don't agree. We don't acknowledge that amount. We haven't admitted it..... The City wasn't named as a loss payee [of the insurance proceeds]. The insurance paid off on the claim and they paid something like $300,000.00 in insurance proceeds. You remember, Judge, that Progressive loan was $200,000.00. So there was $100,000.00 or more unaccounted for.
. . .
Minifield: The policy of fire insurance had been issued to Steadfast Insurance Company and contrary to the quotation with Sportco of Minden had received from R.H. Miller, Inc. the policy of insurance had a schedule of benefits which only provided for payments of insurance benefits to Sportco of Minden, Inc. and two of its creditors, Minden Bank and Trust Company and [PNB] of Desoto Parish. Both of whom was listed as additional loss payees on the said policy, in their  in their favor in the amount of $301,000.00. So that's where the $300,000.00 went. There was no extra $100,000.00 left over here.
. . .
McAnelly: Insurance paid three hundred and something thousand dollars. This three hundred and something thousand dollars could have gone to the City of Minden. Instead it went to the coffers of [PNB]. (Emphasis ours.)
This colloquy evidences the disparate positions of where, precisely, this money was directed after the fire. The record reflects no ledger, accounting, receipt, witnesses or affidavits submitted which evidence that/if PNB or Minden Bank and Trust received some or all of the insurance proceeds. In summary, we are in no position to rule with any degree of certainty where, precisely, the insurance money from this fire has been directed.

CONCLUSION
For the reasons set forth herein, the ruling of the trial court denying the Motion for Summary Judgment of Thomas Ray is affirmed and the ruling of the trial court granting the City of Minden's Motion for Summary Judgment is reversed. Costs of this appeal are assessed to Thomas G. Ray.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
NOTES
[1] As mentioned in the introduction, supra, and as discussed at length, infra, one of the central issues in the case sub judice is whether or not Mr. Ray actually signed the Continuing Guaranty; and, in turn, if he personally guaranteed the executed collateral mortgage or only did so as an agent of Sportco.
[2] Mr. Ray's brief asserts that "the City never gave Sportco credit for the portion of the sale proceeds that were applied to the contract and received by the City. The City has not disputed this fact, thus there is no genuine issue of material fact as to the magnitude of any outstanding balance owed to the City under the contract." This issue is discussed at length, infra.
[3] The briefs indicate that Mr. Ray assigned his shares of stock to Mr. Smith.
[4] Mr. Ray filed an Exception of Prescription on March 6, 2002, and the City filed an Opposition to the Exception approximately three weeks later. The Exception was denied by the trial court.
[5] Mr. Foley's opinion was buttressed by the following statement:

This is the highest degree of confidence expressed by document examiners in handwriting comparisons. The examiner is certain, based on evidence contained in the handwriting, that the writer of the known material actually wrote the writing in question. [i.e.  the signature on the Continuing Guaranty is that of Mr. Ray.]
[6] See, infra.
[7] We note that, aside of this statute, Mr. Ray's brief cites no jurisprudence or other law to support his first assignment of error.
[8] Crochet v. Pierre, 94-543 (La.App. 5th Cir.11/29/94), 646 So.2d 1222, writ denied, 95-0004 (La.2/9/95), 649 So.2d 429. Similarly, the City cites the following line of jurisprudence:

The term "surety contract" and "guaranty contract" may be used interchangeably. Bank of Coushatta v. Patrick, 503 So.2d 1061 (La.App. 2d Cir.1987), writ denied, 506 So.2d 1231 (La.1989[1987]);
The determination of whether or not a contract is clear or ambiguous is a question of law. Louisiana Ins. Guar. Ass'n. v. Interstate Fire and Cas. Co., 93-0911 (La.1/14/94), 630 So.2d 759.
[9] Both parties' briefs discuss, at length, that Mr. Ray's attorney derives a different meaning for the word "security" and the word "securities" as they apply on the Continuing Guaranty. Apparently, he contends that the singular use of the word refers to "movable property" while the plural use of the word refers to actual, certificated instruments, such as "stocks," "bonds" and the like.
[10] Neither party's briefs discuss these issues at length and little was made of these issues in oral argument. Nonetheless, we find that they are genuine issues of material fact in the case sub judice. The trial court's oral reasons did not make mention of either of these two issues.